UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AMANDA ANN BURNHAM,                          14-CV-235-RJA-MJR
                                             REPORT AND RECOMMENDATION
                    Plaintiff,

        -v-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____

        This case has been referred to the undersigned for the preparation of a report

and recommendation on dispositive motions.  (Dkt. No. 13).

        Plaintiff Amanda Ann Burnham brings this action pursuant to 42 U.S.C. §§405(g)

and 1383(c) seeking judicial review of the final decision of the Commissioner of Social

Security denying her Social Security disability insurance benefits and supplemental

security income benefits.  Both parties have moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons

discussed below, it is recommended that Burnham's motion (Dkt. No. 8) be denied and

the Commissioner's motion (Dkt. No. 11) be granted.

## BACKGROUND

I.      *Procedural History*

        On April 1, 2011, Burnham filed applications for Social Security disability

insurance benefits ("DIB") and supplemental security income benefits ("SSI"), alleging

that she has been continuously disabled since March 5, 2011, due to a back disorder,

knee injury, depression, and anxiety.  (R. 87, 94, 134).  The applications were denied on

May 19, 2011, and Burnham requested a hearing before an Administrative Law Judge ("ALJ"). (R. 56, 62).  On November 8, 2012, Burnham appeared before Administrative Law Judge Timothy M. McGuan for the hearing.  (R. 31-47).  She was advised that she had the right to be represented, but after learning that finding representation would delay the hearing, she elected to proceed unrepresented.  (R. 33-34).  On November 30, 2012, the ALJ issued a decision denying Burnham's claims.  (R. 14-30).  Burnham requested review by the Appeals Council.  (R. 11-12).  On February 5, 2014, the Appeals Council denied Burnham's request, making the ALJ's decision the final decision of the Commissioner.  (R. 1-3).  This action followed.

II.    _Summary of the Evidence_

    A.  _Medical Evidence_

Burnham was twenty-six years old at the time of the ALJ's decision.  (_See_ R. 14, 55).  She had a history of asthma since childhood, which was aggravated by stress, exertion, and outdoor allergens.  (R. 230).  She also had a history of trace aortic valve insufficiency, but no restrictions had ever been placed on her activities due to that condition.  (R.169-176).

In 2001, Burnham injured her left knee during karate class.  (R. 210). She had a meniscus repair in 2001 and a left ACL repair in 2002.  (R. 230).  She felt that the surgeries helped somewhat to improve her standing, walking, and knee flexion, but she continued to have pain in her left knee.  (R. 230).  Burnham also had lower back pain dating back to at least 2007.  (_See_ R. 200, 230).

An MRI of Burnham's lower spine on August 19, 2010, showed broad-based disc protrusion or herniation at L4-L5 with compromise of the anterior thecal sac and neural

foramina, facet joint arthropathy, and mild central spinal stenosis. (R. 223). An MRI of the left knee on the same day showed signs of a vertically oriented tear and a tiny joint effusion. (R. 222).

Burnham was involved a motor vehicle accident on October 2, 2010, and was taken to the emergency room. (R. 178). X-rays of her spine and left knee showed no fractures, but her lower back pain worsened after the accident. (R. 181-82, 230).

Burnham began treating with Peter McQuiller, M.D., on January 3, 2011. (R. 210). She told Dr. McQuiller that she had episodes of panic attacks. (R. 210). She reported taking Xanax, Ambien, and Lortab, and she felt that her medications helped with her anxiety and pain. (R. 210). On physical exam, the straight leg raise test was positive on the left side, and her lower back was tender on palpation. (R. 212). Her left knee was tender over the patella. (R. 212). Dr. McQuiller referred her to a psychiatrist and prescribed Cymbalta and hydrocodone-acetaminophen. (R. 213). He did not refill her Xanax. (R. 213).

Burnham returned to Dr. McQuiller's office on January 19, 2011, complaining of back pain. (R. 206). She was advised to continue the current treatment and was referred to physical therapy. (R. 208-09).

On February 10, 2011, Burnham was admitted to the psychiatric department at Niagara Falls Memorial Medical Center. (R. 193). She reported that she had found her boyfriend dead, with their eight-month-old baby lying on his chest. (R. 193). She stated that her boyfriend had damaged his liver from alcohol and was on Suboxone for cocaine withdrawal. (R. 193). Burnham said that her mother was taking care of the baby, but when the doctor called her mother, the mother said that she was not watching a baby

and did not even know that the boyfriend had a baby.  (R. 193-94).  The doctor felt that Burnham's history was "very bizarre" and that she was "minimizing her drug abuse involvement."  (R. 194).  He noted that she was taking various medications, including Ambien, Xanax, Cymbalta, Seroquel, and hydrocodone, but her urine was negative "for everything."  (R. 194).  Burnham was discharged and referred to outpatient mental health services and substance abuse counseling.  (R. 195).

On March 18, 2011, Burnham returned to Dr. McQuiller.  She told him that before her February hospital visit, she had had symptoms of anxiety, decreased appetite, low energy, difficulty concentrating, inability to complete tasks, and crying.  (R. 203).  At this visit, she reported feeling better.  (R. 203).  She reported that she had bought a cat, which helped relieve her anxiety and depression.  (R. 203).

On April 7, 2011, Dr. McQuiller noted that Burnham was complaining of aching pain in her lumbar spine and pain in her joints.  (R. 200).  Burnham felt that her anxiety was under good control and she did not think therapy was necessary at that time.  (R. 200).

Burnham had a consultative psychiatric evaluation on May 10, 2011, by Renee Baskin, Ph.D. (R. 225). Burnham told Dr. Baskin that she had never been able to hold a job for long because of her anxiety and back pain.  (R. 225).  She had difficulty falling asleep and staying asleep because of her pain.  (R. 226).  She reported dysphoric moods, mood swings, loss of appetite, loss of usual interests, decreased energy, and social withdrawal.  (R. 226).  She also noted some nightmares and flashbacks due to finding her fiancé dead.  (R. 226).  She stated that being around a lot of people triggered panic attacks and volunteered, "That's why I couldn't work anymore.  Too

- 4 -

many people."  (R. 226).  She saw a few close friends and family and otherwise stayed home watching television and reading.  (R. 227).  She stated that she could perform her activities of daily living, including dressing, bathing, and managing her money, but because of the constant pain in her back and knee, she had to pace herself and be helped with some tasks.  (R. 227).

Dr. Baskin found that Burnham "would have minimal to no limitations being able to . . . perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks with supervision, make appropriate decisions and relate adequately with others."  (R. 228).  She found that Burnham "would have moderate limitations being able to deal with stress."  (R. 228).  Dr. Baskin recommended psychological treatment and a psychiatric consultation.  She noted, "If the claimant can be stabilized, she might consider some vocational training/ rehabilitation given her youth.  Prognosis is fair to good."  (R. 228).

Dr. Nikita Dave performed an internal medicine examination on May 10, 2011. (R. 230).  Burnham complained that her left knee locked and swelled, and she had constant back pain that was aggravated by lifting and prolonged walking.  (R. 230).  It was difficult for her to lift anything heavy, climb stairs, or do laundry.  (R. 230). She used a knee brace and a cane as needed. (R. 230). On exam, she had painful lumbar spine extension and limited left knee flexion.  (R. 232).

Burnham told Dr. Dave that she had not consulted an orthopedic physician or had any treatment after her MRI's the previous August because she did not have health insurance.  (R. 230).  She planned to start physical therapy the following week when her health insurance coverage began. (R. 230).

In her medical source statement, Dr. Dave wrote the following:

> The claimant is pending further evaluation and testing. Reevaluate in three to four months as she has not had any treatment for her current complaints. She, at this time, may have moderate limitations for prolonged standing, walking, repetitive squatting, kneeling, and crouching on the left knee and repetitive gross motor manipulation through the left knee. She may not be able to do repetitive climbing, running, or jumping. With regard to lumbar spine, the claimant has mild to moderate limitations for repetitive bending, twisting, lifting, carrying, pushing, and pulling of greater than light to moderately-weighted objects. She may also have mild to moderate limitations for prolonged standing and walking. With regard to asthma, she should avoid outdoor allergens in the summer, animal dander, smoke, dust, fumes, inhalants, chemicals, and severe physical exertion. See psychiatric evaluation.

(R. 234).

T. Andrews, a state review psychologist, reviewed Burnham's records and opined on May 18, 2011 that she was able to perform substantial gainful activity in a low-contact setting. (R. 248). Dr. Andrews did not make any specific findings regarding Burnham's ability to deal with stress. (R. 248).

At her hearing on November 8, 2012, Burnham testified that she had never had surgery on her back, and she had not had chiropractic or physical therapy since filing the claim in March of the previous year. (R. 40). She explained that she had been scheduled for physical therapy but then had lost her health insurance. *Id.*

B. *Work History*

Burnham worked in food service between September 2006 and October 2007. (R. 120). The prolonged standing caused her pain. (R. 123-24). For two months during that period, Burnham worked a second job driving parts to a garage. She felt it "was hard, always moving and social[iz]ing due to pain, depression, anxiety." (R. 126).

From October 2008 to April 2009, Burnham worked as a cashier at Tops Supermarket. (R. 120). Burnham also worked as a customer representative for Allstate Insurance between November 2008 and February 2009, a job she found difficult due to her anxiety. (R. 125).

From August 2010 to March 2011, Burnham worked four hours per day as a hostess in a casino. (R. 120-21). She seated customers and carried menus. (R. 121). She noted that the work "hurt a lot" and "[her] anxiety was bad." (R. 121). At her hearing before the ALJ, she testified that she was fired after her fiancé passed away because she "wasn't peppy enough." (R. 36).

After Burnham lost her job at the casino, she applied for unemployment benefits. (R. 36). She looked for office jobs that she could perform despite her back and knee issues. (R. 36).

### C. *Other Evidence*

At the time Burnham filed her application, she was living alone. (R. 112). She prepared her own food daily and was able to do housework, but her activities were sometimes limited by her pain and depression. (R. 114-15). She took care of her cat, including feeding him and cleaning his litter box. (R. 112). She did not often leave the house but was able to drive and shop for food and clothes. (R. 113, 116). She reported that when she went shopping, she could not always handle the crowds and the lines. (R. 116). She was able to pay her bills and handle her bank account. (R. 116).

When summarizing her work history for her Social Security application, Burnham wrote that she had followed her doctors' advice and was trying physical therapy, but her pain had worsened. (R. 127). She wrote that she had had to drop out of school due to

her depression, anxiety and unbearable pain, and she "just want[ed] to sleep all day and not move and not [do] anything."  (R. 127).  Despite this comment in her application, at the time of her hearing before the ALJ in November 2012, Burnham was taking four classes at a local college.  (R. 36-37).  She had taken out loans to pay for college and was receiving $170 per week in unemployment benefits.  (R. 37).

Burnham testified at her hearing that she could not work because she was "depressed" and "bipolar."  (R. 38).  She testified, "My mind's not there and crowds and I get very anxious."  (R. 38).  After the ALJ questioned how she could go to school despite her anxiety, Burnham explained that she was able to attend college because she went to a smaller campus with smaller classes.  (R. 38).  She then agreed that she would be able to work as long as there were not many people around her.  (R. 38).

Burnham testified that she "can't lift a lot of things a lot of times."  because of her back and knee pain, but she could vacuum, do laundry, and carry her cats, which she estimated weighed five pounds.  (R. 38-39, 41).  She could sit or stand for approximately one hour at a time.  (R. 41).  She occasionally took over-the-counter analgesics, but they did not completely relieve her pain.  (R. 39).

## DISCUSSION

### I.    *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential.    The Commissioner's factual determinations are "conclusive" as long as they are "supported by substantial evidence," 42 U.S.C. §405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).    "The

substantial evidence test applies not only to the Commissioner's findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014).  "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may not "substitute its judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (internal citation omitted).

Two related rules follow from the deferential standard of review.  The first rule is that "[i]t is the function of the [ALJ], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  After all, the ALJ "had the opportunity to observe the witnesses' demeanor," a vantage point that entitles the ALJ's credibility determinations to "special deference." *Yellow Freight Sys., Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994).  The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588.

Although the applicable standard of review is deferential, the Commissioner's decision is subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence.  Furthermore, the Commissioner's factual conclusions, even if supported by substantial evidence, must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  Failure to apply the correct legal standard is reversible error. *Id.*

II.    *Standards for Determining "Disability"*

The ultimate question in this case is whether Burnham has a "disability" within the meaning of the Social Security Act.  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A),  1382c(a)(3)(A).  The Commissioner may conclude that a claimant is disabled "only if [the claimant's] physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for the work."  *Id.* §§423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner should base his determination on "objective medical facts, diagnoses or medical opinions based on those facts, subjective evidence of pain or disability, and [the claimant's] educational background, age, and work experience." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process."  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).  The steps proceed as follows.

First, the Commissioner determines whether the claimant is performing "substantial gainful activity."  *Id.* §§404.1520(b), 416.920(b).  If the claimant is engaged in substantial gainful activity, the Commissioner's inquiry is over:  the claimant is "not

disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.* §§404.1520(b), 416.920(b).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §§404.1520(c), 416.920(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities." *Id.* §§404.1520(c), 416.920(c). If the claimant does not have a severe impairment, he or she is not disabled. *Id.* §§404.1520(c), 416.920(c).

Third, if the claimant does have a severe impairment, the Commissioner asks whether that severe impairment meets the duration requirement and whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §§404.1520(d), 416.920(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.* §§404.1520(d), 416.920(d).

If, however, the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the record. *Id.* §§404.1520(e), 416.920(e). Residual functional capacity ("RFC") is the "most [the claimant] can still do despite [his or her] limitations." *Id.* §§404.1545(a)(1), 416.945(a)(1). The Commissioner's RFC assessment is applied at steps four and five.

At step four, the Commissioner "compare[s] [the claimant's] [RFC] assessment . . . with the physical and mental demands of [his or her] past relevant work." *Id.* §§404.1520(f), 416.920(f).  If, based on that assessment, the claimant is able to perform his or her past work, the Commissioner will find that the claimant is not disabled within the meaning of the Social Security Act. *Id.* §§404.1520(f), 416.920(f).

Finally, if the claimant cannot perform his or her past relevant work, at step five the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §§404.1520(g)(1), 416.920(g)(1).  If the claimant can adjust to other work, he or she is not disabled. *Id.* §§404.1520(g)(1), 416.920(g)(1).  If the claimant cannot perform any other work, he or she is disabled. *Id.* §§404.1520(g)(1), 416.920(g)(1).

The burden for steps one through four described above rests on the claimant.  If the claimant carries his burden through the first four steps, then "the burden shifts to the Commissioner to show that there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Sec'y of Health and Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983)).

III.    *The ALJ's Decision*

The ALJ followed the required five-step analysis for evaluating disability claims. Under step one, he found that Burnham had not engaged in substantial gainful activity since March 5, 2011, the alleged onset date.  (R. 19).  He noted that she had received unemployment insurance benefits after that date, which cast some doubt on her credibility because unemployment benefits are available only to people who have certified that they are willing and able to work. (R. 19-20).

At step two, the ALJ concluded that Burnham had severe impairments of "broad-based herniation at L4-5 and compromise of the thecal sac, facet joint arthropathy, mild stenosis with slight bulging of the L5-S1 disc with minor effacement of the thecal sac and early joint arthropathy; left knee suspicious tear along the posterior horn of the lateral meniscus with a tiny joint effusion, depression, and anxiety".  (R. 20).

At step three, the ALJ determined that Burnham did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (R. 20). Specifically, the ALJ concluded that Burnham's impairments did not meet or medically equal the criteria of listings 1.04(A-C) (disorders of the spine), 12.04 (affective disorders), or 12:06 (anxiety-related disorders) in 20 CFR §404, subpart P, appendix 1.  To reach this conclusion, the ALJ addressed whether Burnham met the criteria in Paragraph B of listings 12.04 and 12.06 ("Paragraph B" criteria)[1]. Paragraph B states that the required level of severity is met only if the claimant's mental impairments result in "at least two of the following:  1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  20 CFR §404, subpart P, app. 1, 12.04(B); 20 CFR §404, subpart P, app. 1, 12.06(B).

The ALJ found that Burnham had only a mild restriction in her activities of daily living.  (R. 21). He noted that she was able to drive, vacuum, do laundry, wash dishes, and attend college classes.  *Id.*  He found that she had moderate difficulties with social functioning, but was able to shop for food and clothing, attend school, and communicate

---

[1] Paragraph B of 12.04 and Paragraph B of 12.06 are identical.

on the phone, in person, and on the computer.  *Id.*  He found that she had mild difficulties with concentration, persistence, or pace.  *Id.*  Although she stated that she had problems paying attention and could not always finish what she started, she was able to take twelve credit hours, handle her own finances, read, and play cards.  *Id.* Lastly, she had no extended episodes of decompensation.  *Id.*

The ALJ also considered whether Burnham met the criteria in Paragraph C of 12.04 and Paragraph C of 12.06 and found that these were not satisfied because she was able to adjust to the increased mental demands in her environment, could function outside a supportive living arrangement, and had not been hospitalized for any psychiatric impairments.  *Id.*

At step four, the ALJ determined that Burnham retained "the residual functional capacity to perform light work as defined in 20 CFR §§404.1567(b) and 416.967(b) except she required the option to sit or stand after one hour."  (R. 22).  He specified that she should be limited to no more than occasional interaction with the public.  (R. 22). The ALJ found that Burnham's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  (R. 24).

Because Burnham had no past relevant work experience, the ALJ then proceeded to step five.  (R. 25-26).  Based on the vocational expert's testimony, the ALJ found that Burnham would be able to work at jobs such as office helper or routing clerk. (R. 26).  He therefore found that Burnham was not disabled within the meaning of the Social Security Act from March 5, 2011 through the date of his decision, and that she was therefore not entitled to DIB or SSI.  (R. 26).

- 14 -

IV.    *Burnham's Challenges*

Burnham objects to the Commissioner's determination on the grounds that the ALJ failed to adequately develop the record in this case and failed to adequately weigh the opinion of the consulting psychologist as to her limitations in dealing with stress.

A.    *Failure to adequately develop the record*

The ALJ has a duty to develop the record before making a decision.  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). When the claimant appears *pro se*, the ALJ has "a heightened obligation to ensure both the completeness and the fairness of the administrative hearing."  *Estrada v. Comm'r of Social Sec.*, 13-cv-04278, 2014 WL 3819080 at *3 (S.D.N.Y. Jun. 25, 2014).  The ALJ should be particularly careful to resolve any ambiguities in the records regarding a claimant's psychiatric impairments because mental illnesses can present in complex ways.  *Id.*  However, the ALJ need not seek out every shred of evidence that may be relevant to the claim: "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

Burnham argues that the ALJ failed his duty to develop the record in three ways: (1) he did not elicit sufficient testimony at the hearing; (2) he improperly relied on a preliminary and incomplete evaluation by the internal medicine consultant, Dr. Dave, and (3) he did not advise the plaintiff to seek another medical opinion or a more complete statement from Dr. Dave.  For the reasons set forth below, none of these arguments warrants remand or reversal of the Commissioner's decision.

1.    *The ALJ elicited sufficient testimony at the hearing.*

At her hearing before the ALJ, Burnham was questioned about why she was unable to work and about her activities of daily living.  (R. 36-42).  She testified that she could not work because of her anxiety, depression, back pain, and knee pain.  (R. 39).  She testified that her "mind's not there" and she became anxious in crowds, but she agreed that her mental impairments would not prevent her from working as long as she was not around many people.  (R. 38).  Regarding her back and knee complaints, Burnham testified that she "can't lift a lot of things a lot of times."  (R. 38).  She could not say exactly how many pounds she could lift, beyond admitting that she could pick up her cats, which she believed weighed five pounds.  (R. 36, 41).  Since Burnham could not specify how much she could lift, the ALJ asked her about what she did around the house.  (R. 41).  She stated that she was able to do laundry, vacuum, wash dishes, and cook dinner.  (R. 41).  She could sit or stand for approximately one hour at a time. (R. 40-41).  She testified that her back pain at the time of the hearing was "about an eight" in her lower back, and she tried to relieve it by taking Naproxen, Advil, or Aleve, using heat or ice, or lying flat.  (R. 39).

The ALJ satisfied his duty to "develop the record and resolve any known ambiguities" regarding Burnham's mental impairments.  *Estrada*, 2014 WL 3819080 at *3 (internal citation omitted).  All of Burnham's medical records and her own submissions consistently show that while she became anxious in certain situations, particularly in dealing with strangers, she was generally able to function in public.  For example, she could attend college classes and do her own shopping, and she had worked at several different jobs in the past.  (R. 36-38, 116, 120).  Dr. Baskin, the

consulting psychologist, far from finding that Burnham's psychological condition was disabling, felt that she would benefit from vocational training and that her prognosis was "fair to good." (R. 228). At the hearing, the ALJ questioned Burnham further about why she thought her anxiety and depression disabled her from work, and Burnham confirmed that her problem was that she became anxious if she had many people around her. (R. 38). The ALJ addressed this limitation as part of his RFC assessment, finding that "she can occasionally interact with the public." (R. 22). Burnham herself agreed with this assessment: she testified at the hearing that she would be able to work as long as she did not have to interact with many people. (R. 38).

The ALJ also appropriately questioned Burnham about how her back and knee symptoms affected her functioning. He determined how long she could sit or stand at one time, how severe her pain was, and how she dealt with the pain. (R. 39-41). He also asked her how much she could lift. (R. 41). When she was unable to give a specific number, he inquired into her activities of daily living. (R. 41). Burnham was able to handle the physical demands of vacuuming, laundry, and picking up her cats. (R. 41). Her answers to the questions provided a basis for the ALJ's RFC assessment that she would be able to perform light work if she had an option to sit or stand after one hour. (R. 22).

Burnham was asked at the hearing whether she had any other conditions that would prevent her from working, and she testified, "That's pretty much it. My anxiety, my back, and my knee." (R. 39). This response was consistent with her application and the rest of the administrative record, which does not indicate any other severe

- 17 -

impairments.  Inquiry into other, more minor health conditions such as her asthma was
therefore unnecessary.

        2.    *The ALJ properly considered Dr. Dave's medical opinion.*

        Burnham argues that the ALJ should have obtained a follow-up opinion from the
internal medicine consultant, Dr. Dave, for two reasons: first, because Dr. Dave had
commented that she should be reevaluated in a few months after further testing and
treatment; and second because Dr. Dave's opinion was too vague to support a finding
that Burnham could perform light work.

        Dr. Dave's comment that Burnham should be reevaluated in three to four months
did not oblige the ALJ to obtain a subsequent opinion.  Dr. Dave recommended
reevaluation because Burnham had told her that she planned to start physical therapy.
(*See* R. 230).  Burnham did not have the physical therapy or any other treatment
between the time that she saw Dr. Dave and her hearing before the ALJ, so there was
no reason to reevaluate her. (*See* R. 40).

        Dr. Dave opined that Burnham "may have moderate limitations for prolonged
standing, walking, repetitive squatting, kneeling, and crouching on the left knee"; "may
not be able to do repetitive climbing, running, or jumping"; and had "mild to moderate
limitations for repetitive bending, twisting, lifting, carrying, pushing, and pulling of greater
than light to moderately-weighted objects."  (R. 234).  Dr. Dave's description of "mild"
and "moderate" impairments, if they were not supported by any additional evidence,
would be too vague to support a residual functional capacity assessment. *See Selian v.
Astrue*, 708 F.3d 409, 421 (2d Cir. 2013); *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir.
2000).  However, Burnham's functional capacity was fleshed out by other specific

information in the record as to her capabilities, and the ALJ was not forced to make his determination based on "bare medical findings."  *See Hazlewood v. Comm'r of Social Sec.*, No. 6:12-cv-798, 2013 WL 4039419 (N.D.N.Y. Aug. 6, 2013).  For example, Burnham testified during the hearing that she could sit or stand for an hour at a time. (R. 21, 25).  She was able to push and pull a vacuum cleaner, crouch to clean her cats' litter box, bend to pick up the cats, and lift and carry her laundry.  (R. 41, 113).  Even before the vocational expert testified, Burnham indicated that she could do filing in an office setting despite her back and knee pain.  (R. 36).  Considering the record as a whole, including Dr. Dave's opinion and all of Burnham's statements, the ALJ's residual functional capacity assessment was supported by substantial evidence.

      3.    *The ALJ had no duty to advise Burnham to seek a new medical opinion.*

      The plaintiff's final argument regarding the ALJ's development of the record rests on a broad reading of the holding of *Cruz v. Sullivan*, 912 F.2d 8 (2d Cir. 1990).  In *Cruz*, the ALJ rejected a conclusory opinion by the claimant's treating physician stating that the claimant was disabled but not providing any reasons for the finding.  *Id.* at 9. The ALJ had written to the physician to request an explanation, but the physician did not respond.  *Id.*  The ALJ then rejected the physician's opinion because it was contradicted by other physicians' records.  *Id.*  The Second Circuit found that the ALJ had not adequately developed the record: he should have told the claimant, who was unrepresented, that his treating physician's conclusory opinion did not support a finding of disability and should have given the claimant a chance to obtain a more detailed statement from his doctor.  *Id.*

According to Burnham, it follows from *Cruz* that the ALJ who heard her case was required to advise her that he did not believe that Dr. Dave's opinion supported a finding of disability and that she should seek a more detailed statement from Dr. Dave. (Dkt. No. 8-1 at 18-20).  However, as this court has held in a prior case, *Cruz* does not impose a duty on the ALJ to seek out more records every time he finds that a medical opinion does not support a finding of disability.  *Jackson v. Colvin*, No. 15-cv-6069, 2016 WL 1085412 at *8 (W.D.N.Y. 2016) (appeal pending) (declining to extend *Cruz* to the situation where ALJ discounted one consultative examiner's report over another's).

*Cruz* differs from this case because it involved a decision to reject the findings of a treating physician.  The opinion of a treating physician, unlike the opinion of a consulting physician like Dr. Dave, is given controlling weight unless contradicted by substantial evidence.  *Cruz*, 912 F.2d at 12.  This is because a treating physician will have a better understanding of the claimant's condition, having seen her over time.  *Id.* Because of the special deference given to a treating physician's opinion, if a treating physician makes a finding of disability, without explaining the reasons behind it, the ALJ has a duty to determine how the doctor came to that conclusion. *Id.*   The opinions of a consulting physician such as Dr. Dave are accorded less weight, and the corresponding duty on the ALJ to seek further information before rejecting a consulting physician's findings is lower.  *See Jackson*, 2016 WL 1085412 at *8.

B.    Failure to incorporate the examining psychologist's findings regarding Burnham's stress tolerance

Burnham argues that besides failing to adequately develop the record, the ALJ improperly rejected the findings of consultative psychologist Dr. Baskin and instead

credited the findings of T. Andrews, the state agency review psychologist. Upon review, however, there is no conflict between the two opinions, and the decision to attach more weight to Dr. Andrews' decision than to Dr. Baskin's was not material to the outcome of the case.

Dr. Baskin mentions that the plaintiff had moderate limitations in dealing with stress, while Dr. Andrews did not specifically address her ability to deal with stress. The absence of a specific finding in Dr. Andrews' note does not indicate that he rejected Dr. Baskin's opinion. Reading Dr. Baskin's opinion in its entirety, her finding of moderate limitations in dealing with stress was based on the plaintiff's statements that her panic attacks were triggered by being around large numbers of people. (R. 226). Dr. Andrews' opinion, though it does not use the word "stress," is consistent with Dr. Baskin's. He found that the claimant would be able to perform substantial gainful activity if she were placed in a low contact setting. (R. 248).

The lack of any discussion of Dr. Baskin's stress-related findings in the ALJ's written decision was not material to the outcome of this case. It is true that in some cases, where an individual has a mental disorder that makes it possible to function only in highly structured and controlled settings, the inability to deal with stress may disable a person from any kind of work. SSR 85-15, 1985 WL 56857 at *5 (1985). But the record in this case demonstrates that Burnham's ability to handle stress was not so extreme as to prevent her from functioning in a workplace. None of the medical reviewers, including Dr. Baskin, indicated that Burnham's mental impairments were disabling. Nor did Burnham herself indicate that she was completely disabled because she could not handle stress. She acknowledged at her hearing that could work as long as she was

not around many people, and she was able to handle activities such as taking care of her own finances and attending college classes.   (R. 36-38, 116).   Because the evidence in the record is sufficient to show that Burnham was not disabled by her limitations in dealing with stress, the failure to specifically discuss stress in the ALJ's decision was harmless and does not warrant remand or reversal.

## <u>CONCLUSION</u>

For the foregoing reasons, it is recommended that Burnham's motion for judgment on the pleadings (Dkt. No. 8) be denied and the Commissioner's motion for judgment on the pleadings (Dkt. No. 11) be granted.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72.  Any requests for an extension of this deadline must be made to Judge Arcara.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.***  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law, and/or evidentiary material which could have been, but were not, presented to the

Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

Dated:        August 11, 2016
              Buffalo, New York

                                        */s/ Michael J. Roemer*
                                        MICHAEL J. ROEMER
                                        United States Magistrate Judge